NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

Nos. 08-1658, 08-3876, 08-3849, 08-3969, 08-4556, 08-4816
———

UNITED STATES OF AMERICA

v.

ANTOINE NORMAN,
          Appellant in 08-1658 & 08-3876

CHARLES WHITE,
          Appellant in 08-3849

ALLEN SMITH,
          Appellant in 08-3969

AKINTUNDE CRAWFORD,
          Appellant in 08-4556

MICHAEL MERIN,
          Appellant in 08-4816
———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2:06-cr-00377)
District Judge: Honorable R. Barclay Surrick
———

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 6, 2012

Before: SCIRICA, AMBRO, and VAN ANTWERPEN, *Circuit Judges*.

(Filed: March 7, 2012)

———

OPINION OF THE COURT

———

VAN ANTWERPEN, *Circuit Judge*.

In this consolidated appeal, we are asked to review alleged errors in the convictions and sentences of appellants Akintunde Crawford, Michael Merin, Antoine Norman, Allen Smith, and Charles White. Each of the five appellants was convicted of conspiracy to commit bank fraud and aggravated identity theft, in violation of 18 U.S.C. § 371; bank fraud, in violation of 18 U.S.C. § 1344; and aggravated identity theft, in violation of 18 U.S.C. § 1028A. For the reasons that follow, we will affirm all judgments of conviction but will vacate all sentences and remand for resentencing.

**I.**

Because we write solely for the parties, we recount the facts and proceedings only to the extent required for resolution of this appeal. From approximately February 2004 to November 2005, the appellants actively participated in a bank fraud scheme that targeted four FDIC-insured banks in the Philadelphia area: Commerce Bank, Wachovia Bank, M&T Bank, and PNC Bank. Through repeated fraudulent transactions, appellants defrauded the four banks of hundreds of thousands of dollars. The fraudulent transactions were carried out by a group of "check-runners," five of whom were indicted along with the appellants. The five check-runners—Terry Hughes, Rachel Lukovsky, Kevin Norris, Lisa Smith, and Kelly Taylor—pleaded guilty to their applicable charges and cooperated with the government in its prosecution of this case.

2

To accomplish their criminal objective, appellants unlawfully obtained the personal identification information, including names, dates of birth, addresses, and social security numbers, for customers at the four banks. With this information, appellants recruited the check-runners to pose as the customers and cash counterfeit or closed-account checks[1] or withdraw money from the customers' accounts. Each of the four banks allowed customers to cash checks prior to the checks clearing, but only so long as the amount of the check was equal to or less than the customer's account balance. Shortly before a check-runner would attempt to cash a check, therefore, appellants would try to ascertain the customers' account balance: for check-runs at Commerce Bank, appellants would do this by calling the bank's automated 1-800 telephone system and entering the customers' account and personal identification numbers (PIN).[2]

Due to different security policies at the four banks, appellants employed two different check-running schemes: a "drive-through" scheme and a "walk-in" scheme. The drive-through scheme was used at Commerce Bank to take advantage of the bank's drive-through service which did not require customers to provide picture identification prior to cashing checks. By contrast, the other three banks did not have a drive-through

---

[1] As defined in the government's indictment, "[a] closed-account check is a check that originally was issued to a customer of a bank but became worthless when the account on which it first was issued later was closed. The worthless nature of a closed-account check would not become apparent to the accepting bank until the issuing bank determined that the account was closed and returned it to the accepting bank unpaid."

[2] The default PIN for each customer was the last four digits of their social security number.

3

service and required picture identification. At these three banks, the check-runners would walk inside the bank and use a fake ID provided by the appellants.

Although each of the appellants played a significant role in the conspiracy, their respective roles differed. White was the leader of the check-running operation, with Norman acting as his principal associate. In this capacity, White and Norman performed numerous acts, including obtaining the personal identification information of bank customers; purchasing closed-account checks and fraudulently endorsing them; calling Commerce Bank's automated telephone system shortly before check-runs; and providing "cheat-sheets" to the check-runners containing information about the customer (e.g., social security number, date of birth) that the check-runner might be asked to provide. In addition to White and Norman, Smith assisted the check-running operation by providing fraudulent checks to the check-runners and other tasks. Crawford primarily assisted by preparing fake photo IDs, including fake driver's licenses, for the walk-in transactions, while Merin primarily assisted by providing roughly twenty social security numbers and other personal identification information.

At trial, the government's evidence included, *inter alia*, testimony from several of the check-runners; testimony from an undercover Postal Inspector, Yvette Thomas, who infiltrated the conspiracy; phone records showing a high volume of phone calls between appellants during the time frame of the conspiracy; and incriminating documents found in police searches of a rental car driven by White and the basement of a store, Rah's Fashion Boutique, where Crawford worked during the conspiracy. Based on this and

4

other evidence, each appellant was convicted of one count of conspiracy to commit bank fraud and aggravated identity theft, 18 U.S.C. § 371,  and a combination of bank fraud, 18 U.S.C. § 1344, and aggravated identity theft counts, 18 U.S.C. § 1028A.[3]

During sentencing, the District Court applied several enhancements to the appellants' offense level.  These included a fourteen-level enhancement, per U.S.S.G. § 2B1.1(b)(1), as an offense involving a loss exceeding $400,000; a four-level enhancement, per U.S.S.G. § 2B1.1(b)(2), as an offense involving at least fifty victims; and a two-level enhancement, per U.S.S.G. § 2B1.1(b)(10), as an offense involving sophisticated means.

## II.[4]

### A) Motion to Suppress (White)

We begin our analysis by addressing White's argument that the District Court erred in denying his motion to suppress incriminating documents obtained from an overdue rental car that his wife had rented and which had been reported stolen at the time of the search.  For the reasons that follow, we hold that White does not have standing to bring this claim.

The undisputed facts underlying this dispute are as follows.  On September 19, 2005, White was driving a rental car that had been reported to be stolen.[5]  Although the

---

[3] White and Norman were each convicted of four counts of bank fraud, Crawford three, Smith two, and Merin one.  White was also convicted of sixteen counts of aggravated felony, followed by Norman's twelve counts, Merin's nine counts, Crawford's seven counts, and Smith's four counts.

[4] The District Court had jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under both 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

car was rented by White's wife, the rental agreement had expired. While White was driving, two Philadelphia Police Officers, Thomas Farrell and Joseph Rapone, pulled up behind his vehicle. Soon thereafter, Officer Rapone noticed that the license plate number of the rental car was listed on the police "hot sheet"—a digest of vehicles reported as being stolen within the previous five days.[6] After a check of the Department of Motor Vehicle's (DMV) database confirmed the car's stolen status, the officers signaled for White to stop the vehicle, which he did.

Upon informing White that the car had been reported stolen, White produced a copy of his wife's rental agreement and told the officers he was going to return the car later that day. At that point, Officer Rapone called the rental company's theft department and spoke with a representative who stated that the company considered the car "stolen" and wanted to prosecute the case. White was then arrested and placed in the back of the officers' vehicle. After calling a tow truck to return the car to the rental company, Officer Rapone performed an inventory search during which he found a black leather portfolio under the car's passenger-side seat. Inside the portfolio, Rapone found photocopies of checks and what seemed to be fake driver's licenses and fraudulent identifications.

Prior to trial, White filed a motion to suppress on the ground that the officers did not have probable cause to make the arrest. White asserts that the officers lost whatever

---

[5] Appellant Smith was in the passenger seat.

[6] On the hot sheet, the license plate number was listed with a four-star notation. This notation signified that police should "try and locate" the vehicle.

probable cause they may have had once he produced his wife's rental agreement and told the officers he would be returning the car later that day. According to White, the officers merely had "probable cause to believe that the vehicle was overdue back at the rental agency." The District Court, however, rejected this argument. It ruled that the officers' reliance on three separate sources of reliable information, each indicating that the car was stolen, was more than sufficient to provide probable cause to make the arrest. Accordingly, because the portfolio was found in the car's passenger compartment, the District Court denied White's motion on the grounds that the search was incident to a lawful arrest under this Court's then-prevailing interpretation[7] of *New York v. Belton*, 453 U.S. 454 (1981).

When reviewing a district court's ruling on a suppression motion, we review "for clear error as to the underlying facts, but exercise plenary review as to [the search's] legality in light of the court's properly found facts." *United States v. Kennedy*, 638 F.3d 159, 163 (3d Cir. 2011) (internal quotation mark omitted)). "[T]he proponent of a motion to suppress 'bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy in [the place searched].'" *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (quoting *Rawlings v. Kentucky*, 448 U.S. 98,

---

[7] Subsequent to the District Court's opinion, the Supreme Court issued *Arizona v. Gant*, 556 U.S. 332 (2009), wherein the Court rejected the broad reading of *Belton* that we, and most other circuit courts, had adopted. *See United States v. Schecter*, 717 F.2d 864, 868 (3d Cir. 1983). This is of no moment to White's claim, however, because of our determination that he lacks standing. Even if White had standing, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011).

104 (1980)). Without a legitimate expectation of privacy, the proponent of a suppression motion has no standing to bring the claim. *United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

We begin our review by determining whether White has standing to bring the claim.[8] Although the standing inquiry is a "fact-bound" one, we recently joined the majority of circuits in adopting the "general rule" that, under the precise factual scenario presented here, the driver does not have a legitimate expectation of privacy. *Kennedy*, 638 F.3d at 165. As we stated in *Kennedy*, "the driver of a rental car who has been [loaned] the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy." *Id.* Because this rule squarely applies to the facts of this case, and because there are no extraordinary circumstances to justify an exception,[9] our inquiry is at its end. White lacks standing to bring the claim.

### B) Sufficiency of the Evidence (Crawford & Smith)

---

[8] Although the District Court did not base its decision on standing, that does not preclude us from doing so here. *See Kennedy*, 638 F.3d at 163 ("The Court may . . . affirm the district court on any ground supported by the record . . . .").

[9] As we noted in *Kennedy*, an example of the "extraordinary circumstances" that might overcome the general rule would be a situation where "the defendant was the husband of the woman who had rented the car . . . and had himself 'personally contacted the rental car company . . . and reserved the vehicle in his name, using his own credit card, which was billed for the rental.'" *Id.* at 168 (second omission in original) (quoting *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001)). Here, there is no evidence that White contacted the rental car company, reserved the car in his name, or paid for the car.

8

Both Crawford and Smith challenge the sufficiency of the evidence upon which they were convicted. While Crawford preserved his claim by filing a timely motion for judgment of acquittal, Smith failed to raise his claims below. Accordingly, we will review Smith's claims for plain error only.

When a defendant challenges the sufficiency of evidence upon which he was convicted, our review "is guided by strict principles of deference to a jury's verdict." *United States v. Rosario*, 118 F.3d 160, 162–63 (3d Cir. 1997). Specifically, "we must view the evidence in the light most favorable to the Government," and will only overturn a jury's verdict "when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010) (internal quotation marks omitted). When an insufficiency claim has not been preserved, the defendant's burden is even more onerous, as we review for plain error only. *See United States v. Mornan*, 413 F.3d 372, 381 (3d Cir. 2005). "A conviction based on insufficient evidence is plain error only if the verdict 'constitutes a fundamental miscarriage of justice.'" *United States v. Thayer*, 201 F.3d 214, 219 (3d Cir. 1999) (quoting *United States v. Barel*, 939 F.2d 26, 37 (3d Cir. 1991)). "Such a determination requires that the mistake 'be so clear that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it.'" *United States v. Wright-Barker*, 784 F.2d 161, 171 (3d Cir. 1986).

9

Crawford contests the sufficiency of the evidence upholding his conviction for conspiracy to commit bank fraud and identity theft in violation of 18 U.S.C. § 371.[10] According to Crawford, the record "is utterly devoid of any direct or circumstantial evidence" linking him to the conspiracy. A review of the record, however, belies Crawford's claim. While there was no direct evidence proving Crawford's criminal involvement, there was ample circumstantial evidence from which a reasonable jury could have made that inference. We will briefly review some, but not all, of this evidence.

First, one of the check-runners in the conspiracy, Terry Hughes, testified at trial that White would frequently go to Crawford's store, Rah's Fashion Boutique, immediately prior to, and after, the check-runs.[11] Hughes testified that Crawford was there "pretty much every time I went there," and that, after one check-run, he observed Crawford and White counting up the money that had just been fraudulently obtained. On another occasion, Crawford was alone with White in a car when White gave Hughes a

_____

[10] Although Crawford was also convicted of three counts of bank fraud, 18 U.S.C. § 1344, and seven counts of identity theft, 18 U.S.C. § 1028A, his brief focuses only on the conspiracy count. To the extent, however, that the evidence was sufficient to convict Crawford of the conspiracy, it would be sufficient to uphold the separate convictions, as they were foreseeable crimes committed in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 645–48 (1946) (explaining that conspirator is liable for reasonably foreseeable acts that further conspiracy's aims); *United States v. Gonzalez*, 918 F.2d 1129, 1135 (3d Cir. 1990) (same). Accordingly, we will limit our discussion here to the conspiracy conviction.

[11] Hughes's testimony was consistent with the testimony of Postal Inspector, Yvette Thomas. At trial, Thomas testified that, during her undercover operation, White went to Rah's Fashion Boutigue just prior to the check-run. After White returned from the store, Thomas saw him with a Pennsylvania driver's license featuring a photograph of a black female.

10

fake ID. Hughes also testified that, on one occasion, Crawford provided him new clothes to wear just prior to one of his bank runs.

Second, police seized incriminating documents within an envelope addressed to Crawford in the basement of Rah's Fashion Boutique. In the envelope were counterfeit driver's licenses and numerous passport photographs of unidentified individuals. Moreover, the envelope was found within a box that contained, *inter alia*, a manual for making IDs, a computer disk with a digital image of a fake Delaware driver's license with Crawford's photo superimposed on it, and an application for a Commerce Bank account filled out by Kendrick Ellison. Ellison, who testified at trial, was one of the scheme's victims.

While Crawford argues that there is no evidence showing that he actually "possessed or used" the documents found in the store's basement, a rational jury could have made that inference. Although the police did not search the store until November 2005, or about five months after the last documented check-run, this does not preclude the jury from attributing the seized documents to Crawford, particularly considering that several of the documents were in an envelope addressed to Crawford and that a photograph of Crawford was found on one of the forged driver's licenses. While it is true that Crawford stopped working at the store in October 2005, he stipulated at trial that he continued to frequent the store in November 2005.

Third, phone records introduced at trial established that, during the course of the conspiracy, Crawford had 279 phone calls with White, the conspiracy's ring leader.

11

Although Crawford and White are brothers-in-law, a rational jury would be justified in discrediting the inference that Crawford would have it draw—i.e., that 279 phone calls over the course of a year merely pertained to family and personal matters. Such an inference is improbable in light of other evidence showing Crawford regularly had phone conversations with other co-conspirators. Indeed, according to the phone records, Crawford had 128 phone calls with Merin, 47 phone calls with Smith, and 5 phone calls with Norman. Taken together, the evidence is more than sufficient to uphold Crawford's conviction for conspiracy.

We now turn to Smith's claim that the evidence was insufficient to support his conviction for conspiracy. In making this claim, Smith's brief ignores the fact that Rachel Lukovsky, a check-runner, testified at trial that Smith provided her with checks to cash at the banks. This evidence, in and of itself, is sufficient to sustain Smith's conviction. *See United States v. Perez*, 280 F.3d 318, 344 (3d Cir. 2002) (stating that "uncorroborated accomplice testimony may constitutionally provide the exclusive basis for a criminal conviction" (quoting *United States v. DeLarosa*, 450 F.2d 1057, 1060 (3d Cir. 1971))). This is "particularly" true where defense counsel, as was the case here, had "ample opportunity to cross-examine the Government's witnesses." *Id.* Although Lukovsky's testimony was not the only evidence implicating Smith, it is sufficient to dispose of Smith's claim.

12

Smith also argues that the evidence was insufficient to convict him of aggravated identity theft in violation of 18 U.S.C. § 1028A.[12] Smith contends the government failed to establish that he personally knew the means of identification he unlawfully used belonged to real people. In support of this argument, Smith cites the Supreme Court's opinion in *Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009). There, the Court held that the aggravated identity theft statute, 18 U.S.C. § 1028A, requires proof the defendant knew the means of identification actually belonged to another person. *Flores-Figueroa*, 129 S. Ct. at 1888. The *Flores-Figueroa* Court recognized, however, that "in the classic case of identity theft, intent is generally not difficult to prove." *Id.* at 1893. As the Court noted, "where a defendant has used another person's identification information to get access to that person's bank account, the Government can prove knowledge with little difficulty." *Id.* Under *Flores-Figueroa*, therefore, the government's burden of proving knowledge in a case such as this is minimal. Because Smith's involvement in the bank fraud scheme would have been pointless if the means of identification did not belong to real customers, the government's burden was met.

### C) Prejudicial Variance Between Indictment and Trial Evidence (Smith)

---

[12] Although Smith did file a motion for judgment of acquittal on the aggravated identity theft claims, he did not raise the theory he advances here on appeal. We need not decide what standard of review is appropriate, however, as Smith is not entitled to relief under any standard.

Smith advances another theory on which to overturn his conviction for conspiracy: a prejudicial variance between the conspiracy charged in the indictment and the proof offered at trial.[13] *See United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1990) ("A conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant."). According to Smith, the government charged one conspiracy in the indictment but proved two conspiracies at trial. Specifically, Smith contends that the "drive-through scheme and walk-in scheme represented different conspiracies," as evident by "the refusal of some of the check-runners to participate in the walk-in scheme and Mr. White's practice of talking up the walk-in scheme's profitability and minimiz[ing its] risk." Smith claims that this variance prejudiced him "by lumping him in with members of both conspiracies for a single determination of his guilt or innocence." We disagree. What Smith characterizes as two "conspiracies" were merely two schemes within the same conspiracy.

As we have previously made clear, "a conspiracy with a single objective may be implemented by multiple means and remain a single conspiracy." *United States v. Schurr*, 775 F.2d 549, 554 n.8 (3d Cir. 1985). Here, the conspiracy clearly had a single objective: to make money by defrauding banks. The walk-in and drive-through schemes

---

[13] Since Smith did not raise this issue below, we will review for plain error. Under any standard of review, however, the claim would fail.

were simply different means to accomplish this common objective.[14] A finding of a single conspiracy is further indicated where the "participants overlap in the various dealings." *Kelly*, 892 F.2d at 259. Here, there was extensive overlap. Along with Smith, White, and the other appellants, two of the five check-runners (Lisa Smith and Terry Hughes) participated in both schemes. This was not a case, therefore, of "separate networks operating independently of each other," which is how we have previously defined separate conspiracies. *United States v. Barr*, 963 F.2d 641, 648 (3d Cir. 1992) (internal quotation marks omitted). Accordingly, there was no variance between the indictment and the proof offered at trial.

### D) Sixth Amendment Right to a Jury (Norman & White)

We now turn to the appellants' arguments regarding the sentencing proceedings. We begin first with Norman and White's as-applied Sixth Amendment challenge. Because this claim presents a question of law, our review is plenary. *United States v. Barbosa*, 271 F.3d 438, 452 (3d Cir. 2001).

Under the Sixth Amendment, a criminal defendant has "the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." *United States v. Booker*, 543 U.S. 220, 230 (2005) (quoting *United States v. Gaudin*, 515 U.S. 506, 511 (1995)). In the sentencing context, this right ensures that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum

---

[14] This theory of the case should have been no surprise to Smith as it was expressly set forth in the government's indictment. Indeed, in describing the "manner and means" of the conspiracy, the indictment described the drive-through and walk-in schemes in separate subsections.

authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 244. The maximum sentence authorized by a jury verdict is the maximum sentence established by the legislature (i.e., the "statutory maximum"), which, in the federal sentencing context, is the United States Code. *See United States v. Grier*, 475 F.3d 556, 565 (3d Cir. 2007) (en banc) ("Post-*Booker*, the punishments chosen by Congress in the United States Code determine the statutory maximum for a crime.").

Here, the sentences Norman and White received—thirteen and twenty-one years respectively—were both well below the statutory maximum. *See* 18 U.S.C. § 1344 (establishing maximum prison sentence of thirty years for bank fraud). Norman and White nevertheless advance a theory, one endorsed by Justice Scalia, that the Sixth Amendment right to a jury trial is violated if the sentence would otherwise be unreasonable in the absence of judicially found facts. *See Rita v. United States*, 551 U.S. 338, 375 (2007) (Scalia, J., concurring) (stating that Supreme Court precedent "does not rule out as-applied Sixth Amendment challenges to sentences that would not have been upheld as reasonable on the facts encompassed by the jury verdict or guilty plea"); *see also Gall v. United States*, 552 U.S. 38, 60 (2007) (Scalia, J., concurring) (same). In Norman's case, his Guidelines sentence, based solely on the facts determined by the jury and his prior criminal history, was 8 to 14 months. This range, however, was increased during sentencing to 135 to 168 months based on the District Court's findings regarding (1) the extent of loss caused by the conspiracy, (2) the number of victims suffering a loss,

16

and (3) Norman's role as a manager or supervisor in the conspiracy. Because Norman believes his within-Guidelines sentence of 156 months would be substantively unreasonable in the absence of the District Court's factual findings, he argues that the case presents the type of "as-applied" challenge endorsed by Justice Scalia. White makes a roughly similar argument.

Although appellants' characterization of the right to a jury trial has its adherents, it has been uniformly and unequivocally rejected by the federal circuit courts, including our own. *See Grier*, 475 F.3d at 564–65; *United States v. Hernandez*, 633 F.3d 370, 373–74 (5th Cir. 2011); *United States v. Treadwell*, 593 F.3d 990, 1017 (9th Cir. 2010); *United States v. Ashqar*, 582 F.3d 819, 824–25 (7th Cir. 2009); *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008); *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008); *United States v. Redcorn*, 528 F.3d 727, 745–46 (10th Cir. 2008). In *Grier*, we stated that the only facts a jury must determine are those "that increase the statutory maximum punishment. . . . [O]nce these facts are found, the judge may impose a sentence anywhere under that maximum without jury determinations and proof beyond a reasonable doubt." 475 F.3d at 565. Although *Grier* involved a Fifth Amendment challenge, our interpretation of *Booker* left no room for doubt regarding our view of the Sixth Amendment question at issue here *See id.* at 564–65 (stating that the nonmandatory nature of the Guidelines after *Booker* "makes all of the difference" with respect to Sixth Amendment claims). Accordingly, appellants' Sixth Amendment claim fails.

### E) Enhancement for Fifty or More Victims (All Appellants)

17

Appellants[15] argue, and the government concedes, that the District Court's conclusion with respect to the number of victims must be reconsidered in light of our opinion in *United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009). Our review of a district court's interpretation of the Guidelines is plenary. *Grier*, 475 F.3d at 570.

Under the Guidelines, the offense level of a fraud crime is enhanced by two levels if it involved ten or more victims and by four levels if it involved fifty or more victims. U.S.S.G. § 2B1.1(b)(2)(B). At sentencing, the government argued that appellants' scheme had approximately 146 victims. These victims included the four defrauded banks and the many account holders at these banks whose accounts were compromised. Because the account holders were reimbursed for their losses, however, Norman and White argued that the account holders had not suffered an "actual loss" and were thus not "victims" under the Guidelines; an argument consistent with the prevailing rule of our sister circuits. *E.g.*, *United States v. Conner*, 537 F.3d 480, 489 (5th Cir. 2008); *United States v. Icaza*, 492 F.3d 967, 969–970 (8th Cir. 2007); *United States v. Yagar*, 404 F.3d 967, 971–72 (6th Cir. 2005). At the time of sentencing, however, this Court had yet to address the issue, and the District Court accepted the government's theory that temporary losses could constitute actual loss. Accordingly, the District Court found that the account holders were victims and added a four-level enhancement to the appellant's offense level.

---

[15] Although only Norman, Smith, and White raise this argument on appeal, in the interest of uniformity and justice we will apply our decision to vacate the sentence and remand for resentencing to all five appellants. *See Silber v. United States*, 370 U.S. 717, 717–18 (1962).

Subsequent to the District Court's decision, we held in *Kennedy* that bank account holders who are later reimbursed for their losses are not victims under 2B1.1(b)(2)(B). 554 F.3d at 419. We did note in *Kennedy*, however, that account holders who are later reimbursed may nevertheless qualify as victims if they "spent time or money seeking reimbursement." *Id.* at 422. We will thus remand this matter for proceedings consistent with our opinion in *Kennedy*. In so doing, we will leave it to the District Court's discretion as to whether to allow additional evidence. *See United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 1990) ("[D]ecisions to reopen proceedings are 'traditionally a discretionary matter for the district court.'" (quoting *United States v. Vastola*, 915 F.2d 865, 876 (3d Cir. 1990))).

### F) Loss Attributable to the Conspiracy (Smith & Merin)

Smith and Merin contend that the District Court erred in calculating the total loss attributable to the conspiracy. Under the Guidelines, the loss caused by a fraud offense is a specific offense characteristic that can increase the offense level. U.S.S.G. § 2B1.1(b)(1). Losses exceeding $200,000 but not $400,000 trigger a twelve-level enhancement, while losses exceeding $400,000 but not $1,000,000 trigger a fourteen-level enhancement. *Id.* To determine loss, a sentencing court "need only make a reasonable estimate" based on the available evidence—precision is not required. *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007) (quoting U.S.S.G. § 2B1.1 cmt. 3(C)). As with other sentencing facts, the government bears the burden of proving loss by a preponderance of the evidence. *United States v. Fumo*, 655 F.3d 288, 310 (3d Cir. 2011).

19

Where, as here, the sentencing court's factual findings are challenged, we review for clear error. *United States v. Napier*, 273 F.3d 276, 278 (3d Cir. 2001).

Here, Smith and Merin agree with the District Court that the total loss is between $400,000 and $1,000,000. However, whereas the District Court found a total loss of $789,665, appellants argue that the correct figure is $417,185. While appellants' argument is without practical significance (i.e., even if correct, it would not reduce the offense level), we will nevertheless address it because the issue of total loss does bear on the appellants' arguments with respect to the amount of loss that is individually attributable.

After holding an evidentiary hearing and after accepting written briefs from the parties, the District Court issued a written decision in which it carefully explained its determination that the conspiracy caused $789,665 in financial loss. In its analysis, the District Court scrutinized each of the government's eleven exhibits (Exhibits A–K), and rejected the government's claim that the total loss exceeded $1,000,000. On appeal, Smith and Merin accept the District Court's findings with respect to Exhibits A–E and K ($417,185), but dispute the court's findings with respect to Exhibits F, G, H, I, and J. Although we have reviewed the District Court's findings for each exhibit, we will limit our discussion here to Exhibits G and J, as they represent over ninety percent of the losses in dispute. As will be seen, Smith and Merin have failed to identify any errors, let alone clear errors, in the District Court's opinion.

We begin with Exhibit G, which covers $85,130 in total losses associated with the conspiracy. Exhibit G lists incidents where customers of Commerce Bank were defrauded shortly after their account information was accessed through phone calls to the bank's automated phone system. In its brief to the District Court, the appellants objected to Exhibit G on the grounds that the government witness, Inspector Khary Freeland, had failed to establish at the evidentiary hearing how many of the phone numbers listed as having called the bank belonged to members of the conspiracy. In response to this concern, the District Court independently reviewed each of the phone numbers listed in Exhibit G and found that "all" of them were associated with conspiracy members. The District Court also found that "a close correlation" existed "between the date and time of the inquiry into the account, and the date of the fraud." In other words, shortly after the conspirators called the automated phone system, the accounts that they accessed were defrauded. In their brief to this Court, Smith and Merin act as if the District Court never made these findings, as they simply repeat their earlier argument about Inspector Freeland's testimony without reference to the District Court's subsequent analysis. Accordingly, Smith and Merin have shown no error with respect to the District Court's findings regarding Exhibit G.

Smith and Merin's arguments regarding Exhibit J are similarly flawed. Exhibit J lists fraudulent transactions involving closed-account checks with names that the conspiracy's check-runners were known to have used on other occasions. In their briefs to the District Court, three of the appellants argued that Inspector Freeland had failed to

21

specifically demonstrate during his testimony what percentage of the transactions in Exhibit J were connected to the conspiracy. After receiving these briefs, therefore, the District Court reviewed Exhibit J to assess each transaction's connection with the conspiracy. The results, it noted, were "compelling," with "most of the Exhibit J checks . . . passed within days and at most two weeks, of similar checks passed by the [conspiracy's] runners." As a representative example, the District Court referenced a series of Mode Mederne, Inc., checks, ranging from $900 to $980 in value, which were listed in Exhibit J as being passed on June 9, 2004. This closely correlated with evidence from Exhibit A documenting that one of the conspiracy's check-runners, Kelly Taylor, had cashed three Mode Mederne checks on June 13, 2004, for $960, $980, and $990. In total, the District Court found that $259,222 of the $295,579 in losses identified in Exhibit J were connected to the conspiracy.

Despite the District Court's findings regarding Exhibit J, Smith and Merin focus almost entirely on the alleged inadequacies in Inspector Freeland's testimony.[16] Moreover, the only attempt that Smith or Merin make at discrediting the District Court's analysis does not withstand scrutiny. Smith and Merin state that the District Court's finding regarding the Mode Moderne checks was directly at odds with Inspector Freeland's testimony. This is so, they argue, because Freeland "explicitly testified that he

---

[16] Smith and Merin's account of Freeland's testimony regarding Exhibit J is riddled with mischaracterizations. They state, for example, that the "extent of the link" established by Inspector Freeland was a few checks from an account belonging to Lou Galdieri. Freeland made it clear, however, that he was simply citing the Lou Galdieri checks as representative examples of the types of transactions catalogued in Exhibit J.

could not draw any link between [the Mode Moderne] checks and the conspiracy." An examination of Freeland's testimony, however, reveals no so such assertion. When asked about the Mode Moderne checks, Freeland merely testified that he could not recall how they were connected with the conspiracy without looking at his records, which he was not given the opportunity to do. By contrast, the District Court had the benefit of examining these records in detail. Accordingly, neither Smith nor Merin have pointed to anything in the record indicating the District Court's estimation of loss to be unreasonable.

### G) Individually Attributable Loss (Crawford, Merin, and Smith)

Crawford, Merin, and Smith argue that the District Court erred in attributing the entire loss of the conspiracy to them individually. Under the Guidelines, the loss caused by one conspirator may be attributed to another conspirator if the loss resulted from "reasonably foreseeable acts and omissions . . . in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). As we have previously explained, this requires that the acts of the other conspirator(s) be "(1) in furtherance of the jointly undertaken activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." *United States v. Duliga*, 204 F.3d 97, 100 (3d Cir. 2000). The mere fact that the defendant played a "substantial" role is not sufficient. *United States v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992). Instead, we must determine the scope of the joint criminal activity agreed to by the defendant, and assess whether the acts of others were foreseeable from that vantage point. *Duliga*, 204 F.3d at 100; *Collado*, 975 F.2d at 995.

23

### 1) Loss Attributable to Smith

Smith argues that the District Court erred by attributing to him the $54,600 in losses suffered by M&T Bank and PNC Bank. Smith bases this argument on the fact that he was acquitted of the bank fraud charges involving these two banks. While Smith's claim fails for several reasons, we address only one of them here. Because Smith failed to raise this argument below, he must demonstrate plain error to prevail, which he clearly cannot do. *See United States v. Olano*, 507 U.S. 725, 731–32 (1993). Even if we were to assume that the District Court erred by attributing the M&T and PNC Banks' losses to Smith, this would have no impact on the fourteen-level enhancement that Smith received for causing a loss exceeding $400,000. As detailed above, the District Court reasonably estimated that the total loss caused by the conspiracy was $789,665. Since a reduction by $54,600 would not have placed the loss below $400,000, Smith's sentence was not affected by the alleged error.

### 2) Loss Attributable to Merin

Merin argues that a maximum of $50,000 in losses can be attributed to him. Merin derives this estimate by calculating the losses that resulted from the transactions involving the twenty social security numbers he provided to White and Norman. According to Merin, these transactions were the "only evidence" linking him to the conspiracy, as "no evidence" demonstrated his awareness "of any of the other Defendants or any of the other transactions at any of the other banks." As the District Court noted, however, there is plenty of other evidence linking Merin to the conspiracy, including,

24

*inter alia*: testimony from Kelly Taylor that Merin assisted her and White in some of the check-runs; records showing that Merin called Commerce Bank nineteen times and Wachovia Bank five times during the span of the conspiracy (despite not having an account at either bank); records showing Merin accessed Dax Enterprise's account on Commerce Bank's automated phone system moments before Mike Dicero fraudulently passed a check involving the Dax Enterprise account; statements from Decero that Merin assisted him with fraudulent cash-checking activities; and the discovery of documents at Rah's Fashion Boutique that suggest a link between the defrauding of Dax Enterprise and the larger conspiracy. The District Court also emphasized phone records showing that Merin had at least 314 phone calls with White, 178 phone calls with Norman, 128 phone calls with Crawford, and 6 phone calls with Smith during the course of the conspiracy. As noted by the District Court, it is difficult to believe that the sale of twenty social security numbers required more than 620 phone calls over a twelve-month period.

In his appeal, Merin does not acknowledge or make an attempt to counter the District Court's analysis. Instead, he simply repeats his claim that his "only involvement" with the conspiracy was his sale of the twenty social security numbers. Accordingly, we will affirm the District Court's determination, as we can find no clear error in its conclusion that Merin was "aware of the scope and purpose" of the conspiracy, that his conduct "contributed significantly" to its success, and that the acts of the co-conspirators were "entirely foreseeable and within the scope of the criminal activity that Merin agreed to undertake."

**3) Loss Attributable to Crawford**

Crawford argues that the District Court erred in attributing to him the losses caused by the drive-through scheme. According to Crawford, the most the government could prove was that he helped provide false identifications and clothes to check-runners involved in the walk-in scheme. As we have already discussed, however, the walk-in and drive-through operations do not represent multiple conspiracies, but merely different schemes within the same conspiracy. Moreover, even if this distinction were somehow relevant here, the record contradicts Crawford's claim that he was only involved with walk-ins. As the District Court noted, the documents seized from Crawford's store "contained templates for fake checks, which were used during drive-through runs." Crawford's store also contained documents linking him to the defrauding of Dax Enterprise, which was based entirely on drive-through frauds. In his appeal, Crawford— like Smith and Merin—simply repeats the argument he made before the District Court without countering the District Court's analysis. Since we find persuasive the District Court's factual basis for rejecting Merin's argument, we will affirm.

**H) Enhancement for Sophisticated Means (Smith)**

We turn now to Smith's claim that the District Court erred by assigning a two-level enhancement because the instant offense involved "sophisticated means" per U.S.S.G. § 2B1.1(b)(10). Smith argues that this enhancement was not deserved because "the persons involved in the conspiracy . . . did nothing more complicated than pretend to be people they were not." We disagree. Smith and his conspirators trained a network of

26

check-runners and created numerous false identifications and counterfeit checks in a sufficiently convincing manner to evade detection from four major financial institutions despite hundreds of transactions in which the appellants collected over $780,000. As other federal circuit courts have previously held, "[r]epetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005) (citing *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) and *United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003)); *see also United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996) (upholding enhancement even though "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return"). It is also worth noting that this Court has previously upheld a sophisticated means-enhancement for a fraudulent tax scheme arguably much less elaborate than the instant one. *See United States v. Saybolt*, 577 F.3d 195, 197–98 & n.1 (3d Cir. 2009). Accordingly, we find no error in the District Court's factual determination.

### I) Criminal History Score (Smith)

Smith argues that the District Court erred in determining his criminal history score. Smith, who was assigned seven criminal history points, contends that the District Court erred in assigning three of these criminal history points: one point for a prior prostitution offense, and two points for a DUI sentence that Smith claims was suspended. The government concedes that it was plain error to assign a point for the prostitution

offense, but not an error to assign the two points for the DUI sentence. We agree that it was plain error to assign a point for the prostitution offense.

Under the Guidelines, criminal history points are only assigned for a prior prostitution offense if the offense resulted in "a term of probation of more than one year or a term of imprisonment of at least thirty days," or if the offense was similar to the instant offense. U.S.S.G. § 4A1.2(c)(1). Here, Smith's prostitution offense only resulted in a fine of $300 plus court costs, and is not similar to the instant offense. It was thus incorrect for the District Court to assign the point. Because the addition of the point increased Smith's criminal history category from III to IV, the error prejudiced Smith. Accordingly, we will remand so that Smith's criminal history score can be reduced to six.

Although Smith also argues that the District Court erred in assigning two points for his DUI sentence, this claim is meritless. A district court must assign two points for a prior sentence where the *maximum* sentence imposed was at least sixty days but not more than thirteen months. *Id.* §§ 4A1.1(b), 4A1.2(b). Here, the PSR states that Smith "was sentenced to a term of imprisonment of not less than 48 hours nor more than 12 months." While Smith claims the sentence was suspended, he did not present any evidence to substantiate this claim. Accordingly, the District Court did not err by relying on the information in the PSR. *See United States v. Campbell*, 295 F.3d 398, 407 (3d Cir. 2002) (ruling that sentencing court "did not need to make a further inquiry" into facts in PSR

where defendant failed to present "any evidence . . . cast[ing] doubt" on PSR's accuracy).[17]

**J) Downward Departure (Smith)**

Smith also argues that the District Court erred in refusing to grant a downward departure under U.S.S.G. § 4A1.3. Because it is clear from the record, however, that the District Court knowingly declined to exercise its discretion to grant this departure, we have no jurisdiction to review the claim. *See United States v. King*, 604 F.3d 125, 141 n.9 (3d Cir. 2010).

**K) Reasonableness of Sentence (Smith & White)**

Finally, both Smith and White argue that the District Court imposed a substantively unreasonable sentence by failing to adequately consider the 18 U.S.C. § 3553(a) factors. However, because we have found procedural error in this case, we need not consider arguments about substantive reasonableness at this juncture. *See United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010) ("If the district court commits procedural error, our preferred course is to remand the case for re-sentencing, without going any further.").

---

[17] Even if the District Court did err, it would not constitute plain error since Smith's criminal history category would still be III.

**IV.**

To summarize, we will affirm the judgments of conviction, but vacate the sentences of all appellants so that, on remand, the District Court can reconsider its determination of both the number of victims and appellant Smith's criminal history score.