**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-1390, 13-1546, 13-1640 & 13-1718
_____

UNITED STATES OF AMERICA

v.

ALLEN SMITH,
Appellant
(D.C. Crim. No. 06-cr-00377-002)
_____

UNITED STATES OF AMERICA

v.

ANTOINE NORMAN,
a/k/a Ant

ANTOINE NORMAN,
Appellant
(D.C. Crim. No. 06-cr-00377-004)
_____

UNITED STATES OF AMERICA

v.

CHARLES WHITE,
a/k/a Pooch
a/k/a Pooh

CHARLES WHITE,
Appellant
(D.C. Crim. No. 06-cr-00377-001)
_____

UNITED STATES OF AMERICA

v.

MICHAEL MERIN,
                    Appellant
(D.C. Crim. No. 06-cr-00377-003)
_____


APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
District Judge:  Honorable R. Barclay Surrick
_____


Submitted Under Third Circuit LAR 34.1(a)
April 8, 2014
_____


Before: HARDIMAN, SLOVITER and BARRY,
*Circuit Judges*

(Opinion Filed: May 9, 2014)
_____

Peter A. Levin, Esq.
1927 Hamilton Street
Philadelphia, PA 19130

*Counsel for Appellant Allen Smith*

Kenneth C. Edelin, Jr., Esq.
Suite 1410
1500 John F. Kennedy Boulevard
Two Penn Center Plaza
Philadelphia, PA 19102

*Counsel for Appellant Antoine Norman*

David S. Rudenstein, Esq.
9411 Evans Street
Philadelphia, PA 19115

*Counsel for Appellant Charles White*

Lawrence J. Bozzelli, Esq.
Suite 701
211 North 13th Street
Philadelphia, PA 19107

*Counsel for Appellant Michael Merin*

Zane David Memeger, Esq.
United States Attorney
Robert A. Zauzmer, Esq.
Assistant U.S. Attorney
Chief of Appeals
David J. Ignall, Esq.
Assistant U.S. Attorney
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

BARRY, *Circuit Judge*

Allen Smith, Antoine Norman, Charles White, and Michael Merin were sentenced in 2008 for offenses related to their participation in a conspiracy to defraud banks. On direct appeal, we affirmed their convictions, but vacated their sentences and remanded for the District Court to reconsider two sentencing issues. Now, following resentencing, and in four separate appeals that have been consolidated for disposition, they challenge their new sentences and Smith challenges his new order of restitution. We will vacate the order of restitution and, in all other respects, we will affirm the judgments of sentence.

3

# I.  BACKGROUND

## A.  Trial and the Initial Sentencing[1]

Between February 2004 and November 2005, appellants participated in a scheme to defraud four banks—Commerce Bank, Wachovia Bank, M&T Bank, and PNC Bank—out of hundreds of thousands of dollars.  Although appellants each had individual responsibilities in the scheme, they worked together to steal the personal identification information of account holders at the four banks.  Check-runners, sometimes using false identification cards provided by appellants, would then pose as those account holders and withdraw money from their accounts, at times doing so by cashing counterfeit or closed-account checks.

On July 26, 2006, appellants and six co-defendants were charged with various offenses in a 22-count indictment.  Following trial, appellants were each convicted of one count of conspiracy to commit bank fraud and aggravated identity theft, in violation of 18 U.S.C. § 371.  They were also convicted of one or more substantive counts of bank fraud, in violation of 18 U.S.C. § 1344, and multiple counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

The District Court sentenced appellants at separate hearings between September and December 2008, applying to all of them several offense-level enhancements pursuant to the Sentencing Guidelines.  One was a four-level enhancement under U.S.S.G. § 2B1.1(b)(2) for an offense involving at least fifty victims.  Various within-Guidelines sentences of imprisonment were thereafter imposed, as well as terms of supervised release, special assessments, and orders of restitution.  As relevant here, Smith was ordered to pay restitution of $68,452.

---

[1] Facts regarding the underlying offense conduct are taken from *United States v. Norman*, 465 F. App'x 110 (3d Cir. 2012), in which we resolved the issues appellants raised on direct appeal.

### B. The Direct Appeal

On direct appeal, appellants alleged a number of trial and sentencing errors. As we noted above, we affirmed their convictions, but vacated their sentences and remanded for reconsideration of certain sentencing issues.

The government conceded on direct appeal that resentencing was necessary in light of our decision in *United States v. Kennedy*, 554 F.3d 415 (3d Cir. 2009), which issued subsequent to the sentencings in this case. The District Court had found that appellants' conduct injured 146 victims, including many account holders who were eventually reimbursed by the banks for their losses. *Kennedy* held, however, that account holders who suffer only temporary losses are not victims for purposes of the victim enhancement under § 2B1.1(b)(2). 554 F.3d at 419. We, thus, determined that it was appropriate to remand the case "for proceedings consistent with our opinion in *Kennedy*." *Norman*, 465 F. App'x at 121. In doing so, we noted that, even under *Kennedy*, reimbursed account holders "may nevertheless qualify as victims if they 'spent time or money seeking reimbursement.'" *Id.* (quoting *Kennedy*, 554 F.3d at 422). We left it "to the District Court's discretion as to whether to allow additional evidence" regarding the number of victims. *Id.* We also determined that the District Court erred in calculating Smith's criminal history category. We vacated appellants' sentences and remanded for reconsideration of these two issues.[2]

### C. Resentencing Proceedings

On November 2, 2012, before it held individual sentencing hearings, the District Court held a joint hearing to ascertain, as to all appellants, the number of victims for purposes of § 2B1.1(b)(2).

The government's first witness was Marion Marcuggi,

---

[2] On resentencing, the District Court lowered Smith's criminal history category from IV to III. Smith does not challenge that before us, and we will not address it further.

5

a Commerce Bank customer. Marcuggi testified that, in 2004, Commerce Bank reported that a person using her name made a number of suspicious withdrawals from various bank locations. The next day, Marcuggi drove to her local branch, reported that the transactions were fraudulent, and worked with bank representatives to close her existing accounts and open new ones. Within a few days, Commerce Bank reimbursed the funds that had been taken from the account. Before then, Marcuggi made several trips to the police station to fill out reports and provide information for purposes of the criminal investigation that ensued. She was not, however, reimbursed for any of her time or travel expenses.

Elaine Ford, a PNC Bank customer, was next to testify. After noticing a discrepancy between her bank statement and check register in April 2005 and receiving several late-payment notices during the following month, Ford stated that she drove to her bank to report that money was missing from her account. There, she met with the branch manager, who flagged her account and, together, they contacted the police. One week later, Ford closed her account and opened a new one. She returned to the bank on another occasion to confirm that she was not the individual captured in surveillance footage conducting a transaction on her account and that the signature the unidentified person provided was not Ford's own. Her two trips to the bank took several hours. She also spent approximately three hours on the phone with the bank to resolve the unauthorized activity. PNC Bank replaced the stolen funds one month after Ford first reported the suspicious transactions. The bank did not reimburse her for her time or the cost of transportation to and from the bank.

Postal Inspector Thomas Ninan, the agent assigned to the case, was the government's final witness. He testified that, during the week leading up to the hearing, he interviewed Sandra Posey, Arelis Diaz, Kim Cogswell, Angela Peffley, Michelle Rosmarin, and Joanne Ponzio, all of whom discovered fraudulent activity in their accounts that was traced to appellants' bank fraud operation, and all of whom were eventually reimbursed by their respective banks for the funds fraudulently taken. With the exception of

6

Ponzio, each of those account holders also prepared a written statement.[3] Ninan identified the written statements, and they were admitted into evidence.

According to those statements, Posey, Diaz, Peffley, and Rosmarin discovered that money had been removed from their accounts without their authorization and Cogswell learned from Commerce Bank's fraud department that her account had been closed when fraudulent activity was detected.[4] Each of the account holders traveled to her bank at least once to report that she had not consented to the transactions and to resolve issues related to the fraud. Two of them, Posey and Diaz, were required to go to their banks more than once. Posey went twice, initially to submit a reimbursement form and four or five weeks later because the money had not yet been restored to her account. Diaz visited her bank, located five miles from her home, once or twice a week for a period of two or three weeks, and called the bank every other day inquiring about the status of its fraud investigation and her promised reimbursement.

Some of the account holders stated that they needed to take time off from work to tend to these matters. Cogswell used a vacation day to meet with bank personnel, and Peffley took two unpaid days to try to find out why money was missing and her account overdrawn. Peffley and her husband took another day without pay to attend court proceedings relating to this case. For her part, Diaz cut short a planned vacation to address the unaccounted-for withdrawal on her account and, without adequate funds at her disposal, had to use money intended for her vacation to pay bills that came due.

---

[3] Diaz, Cogswell, Peffley, and Rosmarin provided their written statements directly to Ninan. Posey gave her statement to another inspector, but Ninan confirmed that the written statement matched in substance what Posey said during his interview of her.

[4] Cogswell did not specifically claim in her statement that money was taken from her account, although Ninan's testimony suggests that she was at some point reimbursed for stolen funds.

With respect to Ponzio, Ninan testified that she had planned to appear as a witness but was unable to attend the hearing due to complications from Hurricane Sandy and was unable to provide a written statement. Ninan, therefore, testified as to what she told him during the course of their multiple conversations. In addition, he had prepared a memorandum memorializing those conversations, a memorandum the government provided to appellants on the morning of the hearing. According to Ninan's testimony, Ponzio informed him that, in 2004, she discovered that money was missing from her Commerce Bank account, leaving her with a negative balance and causing some of her checks to bounce. She took a vacation day from work and drove to the bank to resolve the problem and seek reimbursement and to the police station to report the theft. At some point after her visit, Commerce Bank reimbursed Ponzio for the money taken from her account, but did not reimburse her for her time or travel expenses. Ninan testified that Posey, Diaz, Cogswell, Peffley, and Rosmarin similarly made at least one trip to their banks before being reimbursed.

Following the joint hearing, the parties submitted supplemental memoranda addressing the application of the victim enhancement. Appellants objected to the introduction of additional evidence, arguing that the government could have presented this evidence at the initial sentencing hearings but failed to do so. They further asserted that the introduction of witness testimony through Inspector Ninan violated their constitutional rights both under the Confrontation Clause, because they had no opportunity to cross-examine the account holders themselves, and the Due Process Clause, because the witness statements were unreliable and because appellants did not receive those statements from the government until a day or two before the hearing. The District Court rejected their arguments and concluded that the offenses involved twelve victims: the four banks that reimbursed their account holders' losses and the eight account holders who provided statements in court or through Ninan. That finding triggered a two-level enhancement under § 2B1.1(b)(2)(A) for a theft or fraud offense involving ten or more victims.

The District Court subsequently resentenced appellants

8

at individual hearings. The Court reduced the term of imprisonment as to each one, imposed the same special assessment, and maintained or lowered the term of supervised release. It also confirmed the existing orders of restitution against White, Norman, and Merin, but increased Smith's order of restitution by $9,000, from $68,452 to $77,452. Appellants timely filed separate appeals that have been consolidated for purposes of disposition.

## II. ANALYSIS[5]

On appeal, appellants, in varying configurations, press many of the same arguments presented to the District Court. We address each in turn.

### A. Reopening the Record

Smith and White renew their contention that the District Court acted improperly by reopening the record and permitting the government to introduce at the joint hearing additional evidence regarding the number of victims. The District Court's decision to reopen the record is reviewed for abuse of discretion. *United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002).

When determining whether to reopen a proceeding, the paramount factor for a district court to consider is whether reopening, if permitted, would prejudice the party opposing it. *United States v. Kithcart*, 218 F.3d 213, 220 (3d Cir. 2000). Timing is key to this analysis. "If [reopening] comes at a stage in the proceedings where the opposing party will have an opportunity to respond and attempt to rebut the evidence introduced," the possibility of prejudice is greatly lessened. *Coward*, 296 F.3d at 181 (quoting *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985)). In addition, a party that seeks to reopen a proceeding must provide a reasonable explanation for its failure to initially present the evidence. *Kithcart*, 218 F.3d at 220. In this regard,

---

[5] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

"[c]onsideration should be given to whether the law on point at the time was unclear or ambiguous." *Coward*, 296 F.3d at 182.

Appellants were not prejudiced by reopening the record. They received notice of the evidence to be offered by the government prior to the November 2012 hearing and were afforded an opportunity to respond to and rebut that evidence through cross-examination of the witnesses who testified and by the submission of post-hearing memoranda. Appellants also had the opportunity to offer evidence of their own at the hearing, and declined to do so.

Moreover, the government provided a reasonable explanation for why it had not previously offered evidence specifically addressing the *unreimbursed* costs incurred by the account holders who were victimized by appellants. At the time of the initial sentencings, we had not yet decided whether an individual who recovers his or her losses is a victim under § 2B1.1(b)(2), and the District Court accepted the government's theory that temporary losses were sufficient to confer victim status. Certainly, the "prevailing rule of our sister circuits" was that, to be a victim, an individual must suffer a permanent monetary loss. *Norman*, 465 F. App'x at 121 (citing *United States v. Conner*, 537 F.3d 480, 489 (5th Cir. 2008); *United States v. Icaza*, 492 F.3d 967, 969-70 (8th Cir. 2007); *United States v. Yagar*, 404 F.3d 967, 971-72 (6th Cir. 2005)). The decisions of the courts of appeals were not unanimous, however. In *United States v. Lee*, 427 F.3d 881, 895 (11th Cir. 2005), the Eleventh Circuit suggested that even a temporary loss rendered one a victim under the Guidelines. Critically, we had not yet addressed the question, first doing so and rejecting the government's approach in *United States v. Kennedy*, after appellants were sentenced. Thus, the District Court was warranted in determining that the law on point was "unclear or ambiguous" at the time of initial sentencing.[6] *Coward*, 296 F.3d at 182. In view of our

---

[6] Disagreement over § 2B1.1(b)(2)'s definition of "victim" has, in fact, persisted. Shortly after we decided *Kennedy*, the First Circuit squarely rejected our interpretation, concluding that, regardless of whether account holders are reimbursed,

acknowledgement that we would "leave it to the District Court's discretion as to whether to allow additional evidence," *Norman*, 465 F. App'x at 121, the District Court did not overstep the bounds of that discretion when it decided to do just that.

## B.     Adequacy of Evidence and Notice

Appellants also contend that the government's introduction of evidence at the joint hearing violated their constitutional rights and did not comply with the Federal Rules of Evidence. They maintain that the hearing in question was not a sentencing hearing, but was instead an evidentiary hearing at which their Sixth Amendment rights applied. Consequently, according to appellants, the introduction of witness testimony through the witnesses' written statements and Ninan's testimony deprived them of their right under the Confrontation Clause to confront adverse witnesses and constituted impermissible hearsay. In addition, they argue that the unreliability of the hearsay statements and the government's failure to provide them with adequate notice of the evidence it intended to present abridged their right to due process. We review de novo whether the Constitution and Federal Rules of Evidence incorporate the rights envisioned by appellants. *United States v. One Toshiba Color Television*, 213 F.3d 147, 151-52 (3d Cir. 2000) (en banc); *United States v. Pelullo*, 964 F.2d 193, 199 (3d Cir. 1992).

As a preliminary matter, appellants are simply wrong when they argue that the November 2012 joint hearing was something other than part of, and integral to, the resentencing process, even though each appellant may have been sentenced individually at a subsequent proceeding. The joint hearing was held to resolve the applicability of a particular Guideline enhancement pertinent to all appellants. The fact that the District Court heard evidence on this subject, a practice

they sustain an "actual loss" in economic terms and qualify as "victims" if money is taken out of their accounts without authorization. *United States v. Stepanian*, 570 F.3d 51, 55-58 & n.6 (1st Cir. 2009).

11

contemplated by both Federal Rule of Criminal Procedure 32(i) and § 6A1.3 of the Guidelines, does not alter the nature of the hearing. Indeed, on direct appeal we made clear that the only substantive matter on remand was sentencing, and that the District Court could, if it chose, allow additional evidence. *See Norman*, 465 F. App'x at 126-27.

That being so, appellants were not entitled, as a constitutional matter, to confront the account holders whose statements were introduced as evidence at the joint hearing. Indeed, we have held that, according to "well settled" precedent, "the Confrontation Clause does not apply in the sentencing context and does not prevent the introduction of hearsay testimony at a sentencing hearing." *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007); *accord United States v. Powell*, 650 F.3d 388, 392-93 (4th Cir. 2011) (explaining that the courts of appeals have uniformly held and recent Supreme Court cases further suggest that Confrontation Clause rights apply only "during the determination of [defendants'] guilt or innocence" and not during the sentencing phase).

This conclusion also disposes of appellants' hearsay objection. In sentencing proceedings, the Federal Rules of Evidence do not apply and a district court may rely on hearsay. Fed. R. Evid. 1101(d)(3); *United States v. Miele*, 989 F.2d 659, 663 (3d Cir. 1993).

That does not mean, of course, that a sentencing court's consideration of hearsay is unbounded. Pursuant to the Due Process Clause, hearsay statements may be used at sentencing only if they bear "some minimal indicium of reliability beyond mere allegation." *Robinson*, 482 F.3d at 246 (internal quotation omitted). The evidence offered through Inspector Ninan surely satisfied that standard. The statements of the account-holder victims, just like the victim-impact statements routinely considered at sentencing hearings, involved matters within the knowledge of each declarant and were made in the course of interviews by one or more law enforcement officials. Ninan confirmed that he had interviewed each victim and that each statement submitted to the District Court was either drafted during the course of his

12

interview or, in the case of Posey, consistent with information she had provided to him and to another inspector. Ninan's testimony as to what Ponzio told him during their conversations is also sufficiently reliable. We have long accepted an agent's recitation of information obtained from a third party who appears credible, and the District Court was presented with no reason to doubt Ponzio's credibility. *See, e.g.*, *United States v. Paulino*, 996 F.2d 1541, 1548 (3d Cir. 1993) (finding at least minimally reliable an agent's recounting of a conversation with "a reliable confidential informant").

We are not unmindful of appellants' argument that Ninan did not interview the account holders until days before the hearing, the topics discussed in each statement were quite similar, none of the interviews was taped, and—with the exception of the Ponzio interview—Ninan did not take notes. Nevertheless, these arguments are not sufficient to render the account holders' statements unreliable, particularly given that the record was devoid of anything to contradict their recounting of events. Indeed, appellants offered nothing aside from bare speculation to suggest that Ninan exercised undue influence over what the account holders reported in their statements. As the District Court noted, it was reasonable for Ninan to ask each one similar questions given the narrow sentencing issue before the Court, i.e., whether she suffered unreimbursed losses due to the fraud on her account. And there was nothing in Ninan's testimony to suggest that the questions posed were in any way leading or improper. Moreover, the District Court, before which, of course, Ninan testified, deemed his testimony to be credible. That assessment is entitled to substantial deference. *United States v. Givan*, 320 F.3d 452, 464 (3d Cir. 2003).

Finally, appellants offer no authority—either binding or even persuasive—for the proposition that due process obligates the government to supply a criminal defendant with advance notice of evidence it intends to present at a sentencing hearing. Certainly, neither the Supreme Court nor this Court has interpreted the Due Process Clause to require

13

any such thing.[7]  *United States v. Reynoso*, 254 F.3d 467, 473 (3d Cir. 2001); *United States v. Jackson*, 649 F.2d 967, 978-79 (3d Cir. 1981) (observing the lack of any precedent holding that due process requires the government to give notice of the evidence it will offer at sentencing).  Appellants' due process challenge is, therefore, unavailing.

## C.     Judicial Factfinding

White and Norman argue, as they did on direct appeal, that the District Court violated their Sixth Amendment rights by enhancing their Guidelines range on the basis of judge-found facts.  They contend that a jury, not a sentencing judge, must find any facts that increase a defendant's sentence, even if, as in this case, the sentence implicated neither a mandatory minimum nor a statutory maximum.  Our review over this issue of law is plenary.  *United States v. Barbosa*, 271 F.3d 438, 452 (3d Cir. 2001).

Whatever support White and Norman's position may find from non-authoritative sources, it is foreclosed by our precedent.   We have stated, sitting en banc, that the constitutional rights to a jury trial and proof beyond a reasonable doubt attach only to facts that "constitut[e] the elements of a crime," which are those facts that increase the maximum statutory punishment to which the defendant is exposed.  *United States v. Grier*, 475 F.3d 556, 562 (3d Cir. 2007) (en banc) (relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).   Facts relevant to the application of various Guidelines provisions, which are advisory only, do not implicate these rights.  *Id.* at 567-68.  A district court may,

---

[7] We have, on the other hand, interpreted Federal Rule of Criminal Procedure 32 to require pre-hearing disclosure of documents on which a district court will rely at sentencing. *United States v. Nappi*, 243 F.3d 758, 764 (3d Cir. 2001). Appellants have not lodged an objection under Rule 32, however, and, even if they had, there was no violation of that Rule.  Given the limited number and uncomplicated nature of the statements here, notice of that evidence one or two days prior to the hearing was sufficient to satisfy the Rule's disclosure requirement.  *See id.* at 765.

consistent with the Fifth and Sixth Amendments, engage in additional factfinding, using a preponderance-of-the-evidence standard, to select an appropriate sentence up to the statutory maximum based on application of the Guidelines. *Id.* at 562-68. Indeed, we held as much when this very issue was raised on direct appeal. *Norman,* 465 F. App'x at 120-21.

The Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), has not changed the field of play. *Alleyne* simply held that, as with facts necessary for the imposition of a statutory maximum sentence, facts that trigger a statutory mandatory minimum sentence must, under the Sixth Amendment, also be submitted to a jury. *Alleyne*, 133 S. Ct. at 2160. *Alleyne* did not curtail a sentencing court's ability to find facts relevant in selecting a sentence *within* the prescribed statutory range. *Id.* at 2163. Thus, the District Court did not commit legal error in so doing.

## D. 10-Victim Enhancement

The central issue on appeal is whether the District Court correctly determined the number of appellants' victims, as defined in § 2B1.1(b)(2). We exercise plenary review over the District Court's interpretation of the Guidelines and review its factual findings for clear error. *Grier*, 475 F.3d at 570.

Under the Guidelines, a defendant convicted of a theft or fraud offense is subject to a two-offense-level enhancement if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A). The Commentary to the 2005 version of the Guidelines, which all parties agree is the version applicable to sentencing in this case, defined "victim" as "any person who sustained . . . actual loss." *Id.* § 2B1.1 cmt. n.1.[8] "Actual loss," in turn, is defined as "the reasonably

---

[8] Guidelines Commentary "that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S.

15

foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). The Application Notes explain that "'[p]ecuniary harm' means harm that is monetary or that otherwise is readily measurable in money," and, therefore, does not include non-economic harm. *Id.* cmt. n.3(A)(iii). Certain forms of economic damages are also excluded from the Guidelines' definition of "actual loss." These include "costs incurred by victims primarily to aid the government in[] the prosecution and criminal investigation of an offense." *Id.* cmt. n.3(D).

As we mentioned at the outset of this Opinion, we interpreted § 2B1.1(b)(2)'s victim enhancement provision in *United States v. Kennedy*. The defendant in *Kennedy* used her position as a manager of senior citizen benefits accounts to steal money from 34 individual account holders. After reviewing the statutory language in light of the Commentary which, we note, is still applicable in this case, we held that only those parties who suffer permanent "pecuniary harm" constitute "victims" under § 2B1.1(b)(2). *Kennedy*, 554 F.3d at 419. We, therefore, found that the district court in *Kennedy* erred by including as victims individual account holders who were later reimbursed the money that the defendant had removed from their accounts. The government, we stated, "failed to meet its burden to prove that the account holders even knew that their funds had been stolen before they were completely reimbursed."[9] *Id.*

_____

36, 38 (1993); *see also United States v. Keller*, 666 F.3d 103, 108 (3d Cir. 2011).

[9] The government correctly points out that, later in 2009, the Commentary to § 2B1.1 was amended and expanded the definition of "victim" to include not only persons who suffered actual loss but also those "whose means of identification [were] used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n.4(E)(ii). In making this change, the Sentencing Commission cited our decision in *Kennedy*. The Commission explained that any individual whose identity is stolen should be considered a victim for purposes of the enhancement, "even if fully reimbursed," because a target of identity theft "must often spend significant time resolving credit problems and related issues, and such lost time may not

16

Our opinion in *Kennedy* went on to explain that our interpretation was consistent with the law of other circuits, and we surveyed opinions of several of our sister courts of appeals. Chief among them was the Sixth Circuit's decision in *United States v. Yagar*. *Yagar* held that an account holder who is fully reimbursed for stolen funds cannot be considered a victim under the Guidelines. *Id.* at 419-20 (reviewing *Yagar*, 404 F.3d at 971). *Yagar* suggested, however, that account holders who recoup those monies might still be victims if, as a practical matter, they suffered some additional pecuniary harm. *Id.* at 420. Drawing on this "*Yagar* carve-out," the Second, Ninth, and Eleventh Circuits found that individuals who expend time, effort, and money before successfully obtaining reimbursement suffer an actual loss and remain victims under § 2B1.1(b)(2). [10] *Id.* at 421-22

---

be adequately accounted for in the loss calculations under the guidelines." *Id.* app. C (2011) (discussing amendment 726). No party contends that this change has any bearing on this case.

[10] For his part, Norman contends that the account holders cannot be victims because their monetary losses were not specifically calculated and counted as part of the District Court's loss calculation. The Second, Ninth, and Tenth Circuits have all found that a party may be considered a victim only if the party's loss was included in the court's overall loss estimate. *Armstead*, 552 F.3d at 780-81; *Abiodun*, 536 F.3d at 169; *United States v. Leach*, 417 F.3d 1099, 1106-07 (10th Cir. 2005). Norman did not raise this argument in the District Court, however, and we, therefore, review for plain error. *United States v. Russell*, 564 F.3d 200, 203 (3d Cir. 2009); Fed. R. Crim. P. 52(b). To prevail on appeal under plain error review, a defendant "must establish an error that is plain, which affect his substantial rights, and which, if not rectified, would seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Ward*, 626 F.3d 179, 183 (3d Cir. 2010). Here, Norman fails to satisfy that standard because he has not established an error that was plain. We note that, unlike the Second, Ninth, and Tenth Circuits, we have not spoken as to how district courts must account for the number of victims in the loss calculation, and we decline to do so here.

17

(discussing *United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008); *United States v. Armstead*, 552 F.3d 769 (9th Cir. 2008); *United States v. Pham*, 545 F.3d 712 (9th Cir. 2008); *Lee*, 427 F.3d at 895). We agreed with the general approach of those courts, and stated that "had the Government shown that the account holders that Kennedy defrauded spent time or money seeking reimbursement, this would be a closer case." *Id.* at 422. No such evidence had been presented, however. Our apparent approval of the carve-out recognized in "the *Yagar* line of cases" was, therefore, obiter dictum. *Id.*

This case presents the opportunity to adopt *Kennedy*'s dicta as a holding of our Court: a party that is reimbursed for stolen funds but, as a practical matter, suffers additional pecuniary harm may qualify as a victim suffering "actual loss" under § 2B1.1(b)(2).[11] We see no need to define the full scope of pecuniary harm capable of conferring victim status. For purposes of this case, it is sufficient to hold that one example of cognizable pecuniary harm is the expenditure of time and money to regain misappropriated funds and replace compromised bank accounts. This interpretation of "actual loss" and "victim" comports with both the Guidelines and the conclusions of coordinate appellate courts, not to mention the commonsense proposition that an account holder who must spend time and resources to dispute fraudulent activity, recoup stolen funds, and repair his or her credit and financial security has suffered a monetizable loss that is a reasonably foreseeable and direct consequence of the defendant's theft or fraud. *See, e.g.*, *Pham*, 545 F.3d at 721; *Abiodun*, 536 F.3d at 168-69.

Here, the District Court did not clearly err in determining that appellants' offenses involved twelve victims,

---

[11] Again, the 2009 amendments to the Guidelines Commentary, which do not apply in this case, appear to make it easier for targets of identity theft to qualify as victims. Thus, what we say here regarding the requirements for victim status may not necessarily extend to the subjects of identity theft under the revised Guidelines Commentary. *See Keller*, 666 F.3d at 108 (finding that we are bound by amendments to Guidelines Commentary).

a number sufficient to trigger the ten-or-more-victims enhancement. The parties, save one, agree that the four banks from which funds were taken constitute victims of appellants' bank fraud conspiracy.[12] The government also presented evidence that the eight individual account holders suffered actual, pecuniary losses as a result of appellants' conduct. Appellants are correct that the time and money spent by these account holders to assist in the investigation by law enforcement and the eventual prosecution—their trips, e.g., to the police station and to court—cannot be deemed actual loss. U.S.S.G. § 2B1.1 cmt. n.3(D)(ii). Even so, the account holders suffered monetizable harm in their efforts to regain the funds taken from their accounts, efforts that necessarily included reporting the fraud to their respective banks and disputing the unauthorized activity in the first instance.

After noticing suspicious activity and prior to being reimbursed by her bank, each of the eight account holders traveled to a branch office at least once to deal with the fraud. Some of them were required to make multiple trips or phone calls to have their funds restored and establish new accounts, spending hours of their time to do so. These account holders were not reimbursed for the expenses involved with their trips or the time spent in communication with the banks. Additionally, Ponzio, Cogswell, and Peffley had to take time off from work and use vacation days to attend meetings at their banks, Diaz was forced to cut short her vacation to resolve her financial troubles, and Rosmarin paid a credit service to investigate her credit rating in the wake of the unauthorized account activity she had suffered. These are the very sorts of actual losses recognized by courts following *Yagar*, and are sufficient to confirm the eight account holders' status as victims under the Guidelines. *See Pham*, 545 F.3d at 721 (finding forfeited vacation days and the cost

---

[12] Only Smith disagrees. He challenges the inclusion of M&T Bank as a victim of his conduct, as he was acquitted of the bank fraud charge with respect to it. His claim is of dubious merit, given that he was convicted of conspiracy to commit bank fraud and the conspiracy's activity targeted that bank. But even if we do not consider M&T Bank's victim status as to Smith, there remain ten or more victims of his conduct.

of gas for trips to and from banks, telephone calls, stamps, and replacement checks related to resolution of disputed account activity and initiation of fraud investigations with credit reporting services could constitute "actual loss" under the Guidelines); *Abiodun*, 536 F.3d at 168-69 (finding the value of "lost time" spent securing reimbursement could constitute "actual loss"); *cf. Conner*, 537 F.3d at 491 (noting the possibility that the value of "business time" spent paying fraudulent charges could be considered an "actual loss").

Appellants counter that it is only the expenditure of substantial or appreciable amounts of time and money that constitutes actual loss—far more, they suggest, than that spent by the account holders here. It is certainly true that *Yagar* found that the account holders in that case could not qualify as victims because the money taken from their accounts was "immediately covered by a third-party" and their losses were "short-lived." *Yagar*, 404 F.3d at 971. Other courts, relying on this language, have intimated that the speed of reimbursement or the magnitude of costs realized bears on whether an account holder has suffered an actual loss. *See, e.g.*, *Pham*, 545 F.3d at 719-20; *Lee*, 427 F.3d at 895. But the controlling question for the *Yagar* court was whether the account holders "suffered [an] adverse effect as a practical matter from [the defendant's] conduct," not the number of days or amount of money it took to regain their stolen funds.[13] *Yagar*, 404 F.3d at 971. In *Yagar*'s factual recitation, there is simply no indication that the account holders had to expend any time or resources to secure reimbursement.

In view of *Yagar*'s rationale, which we adopt, we see no principled reason to treat only appreciable or substantial

---

[13] Indeed, the *Yagar* court went so far as to analyze whether there was sufficient evidence to find that six account holders suffered pecuniary harm when they had to order new checks. *Yagar*, 404 F.3d at 971-72. Although the court found that the record failed to establish who ultimately paid for the new checks, the account holders or their banks, it did not find that reordering checks, which assuredly requires minimal time and money, was too small a cost to constitute an "actual loss."

expenditures of time and money as "actual losses" under the Guidelines. The size of the loss has no bearing on its ability to be monetized, its foreseeability to the defendant, or its nexus to the offense conduct. Nor would the lack of an "appreciable" loss requirement transform every customer whose account is invaded into a Guidelines victim, rendering superfluous the "actual loss" element. As the facts of *Kennedy* demonstrate, some account holders may be reimbursed before they even realize that money has been taken from their accounts. *See Kennedy*, 554 F.3d at 419. In sum, the account holders in this case suffered unreimbursed, albeit small, losses in attempting to redress the fraudulent activity perpetrated by appellants. We hold that they are victims under the Guidelines.

Smith makes one last argument against application of the victim enhancement, an argument that need not long detain us. He argues that a separate Guideline provision, § 2B1.6, renders the § 2B1.1(b)(2) victim enhancement inapplicable. The Application Notes to § 2B1.6 state that, if a sentence for aggravated identity theft under 18 U.S.C. § 1028A is imposed in conjunction with a sentence for a separate, underlying offense, as it was in this case, the district court should not apply an enhancement "for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense." U.S.S.G. § 2B1.6 cmt. n.2. Quite plainly, the victim enhancement under § 2B1.1(b)(2) is not an enhancement based on the use of a "means of identification"; it is an enhancement based on the number of victims. Section 2B1.6 does not preclude application of the victim enhancement with respect to appellants' bank fraud offenses.

### E.     The Order of Restitution as to Smith

In its initial judgment of sentence, the District Court ordered Smith to pay restitution in the amount of $68,452. This amount reflected losses incurred by Commerce Bank and Wachovia Bank. Although Smith's pre-sentence report identified a $9,000 loss to M&T Bank, as well, the Probation Department took no position as to whether Smith should be held responsible for that amount or for any loss to PNC Bank.

21

(Smith PSR ¶¶ 68, 170.) Those losses were certainly attributable to the activities of the conspiracy, but Smith had been acquitted of the substantive fraud counts relating to those institutions. At sentencing, the District Court did not hold Smith responsible for the losses to M&T Bank or PNC Bank, and neither Smith nor the government appealed that ruling.

During Smith's resentencing, however, the District Court, at the parties' urging, revisited the matter of his restitution. The government argued that Smith should be held jointly and severally liable for repaying the $9,000 loss incurred by M&T Bank because it was a reasonably foreseeable consequence of and attributable to the conspiracy of which he was a member. Smith maintained that his order of restitution should be reduced to $0. He argued that his acquittal on the substantive count relating to M&T Bank precluded any responsibility as to him for the loss realized by that institution, and that he should not be ordered to pay restitution to the other banks because they failed to submit loss reports to the Probation Department. The District Court agreed with the government, and increased the amount of Smith's restitution by $9,000 to $77,452.

On this appeal, Smith again contends that his restitutionary obligation should be extinguished; however, the government has altered its position. It now contends that the initial order of restitution in the amount of $68,452 should be reinstated, and concedes that the District Court exceeded the scope of our remand by reconsidering that issue. We exercise plenary review as to whether the District Court properly interpreted and applied our mandate. *Kilbarr Corp. v. Bus. Sys. Inc., B.V.*, 990 F.2d 83, 87-88 (3d Cir. 1993).

The government is correct. The District Court exceeded the scope of our mandate when it revisited its initial order of restitution against Smith, although in so doing it was clearly doing what counsel had asked it to do. Our mandate identified only two sentence-related issues for the District Court to reconsider on remand: (1) the determination of the number of victims for purposes of a particular Guideline enhancement and (2) the calculation of Smith's criminal

22

history category. *Norman*, 465 F. App'x at 126-27; Judgment, *United States v. Norman*, 465 F. App'x 110 (3d Cir. 2012) (No. 08-3969). At no point did we authorize the parties to reargue or the District Court to revisit its ruling on the amount of restitution ordered against Smith.

That aside, the parties waived any argument that the amount of restitution as to Smith should be different. A party may not litigate on remand or subsequent appeal issues that "were not raised in [the] party's prior appeal and that were not explicitly or implicitly remanded for further proceedings." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 203 (3d Cir. 2004). We will, therefore, vacate the revised restitution order as to Smith and remand for the District Court to reinstate its initial order in the amount of $68,452.

### F.    Merin's Remaining Argument

Merin raises one additional argument. He contends that the evidence at trial failed to establish an agreement on his part to undertake or aid all of the conspiracy's bank fraud activity, and so the District Court erred in attributing to him the full loss caused by the conspiracy. Merin raised, and we rejected, this same loss-calculation argument on direct appeal. *Norman*, 465 F. App'x at 123-25. That decision is law of the case, and Merin has not shown the "extraordinary circumstances" we generally require before we will revisit a prior decision in the same action.[14] *Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191, 207 (3d Cir. 2010).

### III.    CONCLUSION

For the foregoing reasons, we will affirm the judgments of sentence, but will vacate the order of restitution imposed against Smith and remand with instructions to reinstate the initial order of restitution of $68,452.

---

[14] To the extent that Merin also challenges the sufficiency of the evidence underlying his conspiracy conviction, he failed to raise this argument on direct appeal and it is, accordingly, waived. *See Skretvedt*, 372 F.3d at 203.

23