**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-1980
_____

UNITED STATES OF AMERICA

v.

SHAMONE KENNEDY,

Appellant.


_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 06-cr-00023)
District Judge: Honorable Berle M. Schiller

Argued October 6, 2010

Before: FUENTES, JORDAN, ALDISERT, <u>Circuit Judges</u>

(Opinion Filed: March 16, 2011)

Paul J. Hetznecker, Esq. [ARGUED]
1420 Walnut Street

1

Suite 911
Philadelphia, PA 19102

       <u>Counsel for Appellant</u>

Kathy A. Stark, Esq. [ARGUED]
Zane David Memenger
Robert A. Zauzmer
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

       <u>Counsel for Appellee</u>

------

## OPINION OF THE COURT

------

FUENTES, <u>Circuit Judge</u>:

Acting on an arrest warrant, police arrested Shamone Kennedy and impounded a nearby rental car that Kennedy's girlfriend had lent him a few days earlier. Following an inventory search, police found two guns and 200 grams of cocaine inside the car. Kennedy moved to suppress the evidence found in the car, contending he had a legitimate expectation of privacy in its contents. The District Court denied the motion. Because we find that the driver of a rental car whose name is not listed on the rental agreement generally lacks a legitimate expectation of privacy in the car,

we conclude that Kennedy's suppression motion was properly denied. Accordingly, we will affirm.

## I.

### A.

Following the arrest of two minors in connection with stolen firearms, Detective Quinn of the Coatesville City Police Department received information indicating that some of those firearms had been sold for money and drugs at a home on First Avenue to a man known as "Tex" and later identified as defendant Kennedy. Police subsequently obtained a warrant and searched the home on First Avenue, where they found guns, drugs, and personal effects belonging to Kennedy. A federal warrant was issued for Kennedy's arrest on January 18, 2006.

Six days earlier, on January 12, 2006, Kennedy's girlfriend Courtney Fields had rented a silver Toyota Camry from Kulp Car Rental and given the key to Kennedy, who used the car until January 18, 2006. Kennedy's name was not listed on the rental agreement.

On January 18, a police informant who knew Kennedy notified Detective Chris McEvoy that earlier in the day he had seen Kennedy driving a silver Toyota Camry, the car Fields had rented, on Chestnut Street between 7th and 8th Streets. McEvoy then passed this information on to the day and evening shifts of the Coatesville Police Department. Later that evening, at approximately 9:00 p.m., Officer John Regan, Corporal Sean Knapp, and Sergeant Martin Brice encountered Kennedy—wearing black gloves and carrying in

3

his right hand a rental key inscribed with the Kulp Car Rental insignia and listing the car it belonged to as a silver Toyota Camry—walking diagonally across Chester Avenue and down the hill toward East Lincoln Highway. The officers placed Kennedy under arrest pursuant to the warrant. They then searched Kennedy and found on his person $2,692 in United States currency, a set of keys, and four cell phones. The District Court later determined that Kennedy was a validly licensed driver.

After Kennedy was taken to the police station, Officer Regan asked him where he lived. Kennedy said he lived at 714 East Lincoln Highway, a house less than a block from the location of the arrest. Officer Regan went to that location and soon found a silver Camry on Chester Street with a Kulp Car Rental bracket around its license plate. In the meantime, Sergeant Brice spoke with Kulp Car Rental's owner, who requested that the police tow the car to the police station. While Officer Regan waited for a tow truck, three people approached the car from East Lincoln Highway, at which time Officer Regan instructed them to move away from the vehicle. The man and two women continued up the street to a house where they watched Officer Regan and the car from the front porch and window. One of the three was Courtney Fields, Kennedy's girlfriend and the person who had rented the car and given Kennedy the key.

Following the car's impoundment, Detective Martin Quinn directed Corporal Scott Neuhaus to conduct an inventory search of the car pursuant to Department policy so that the vehicle could then be picked up by someone from Kulp. Corporal Neuhaus began the inventory search with the trunk, where he found a partially opened duffle bag

4

containing a disassembled rifle in three pieces. He immediately stopped the search and spoke with Detective Quinn, who then sought a search warrant for the entire vehicle. That same day, at her request, Fields's attorney informed the police that there could be drugs in the car.

On January 20, 2006, Detective McEvoy and Detective Sean Murrin received a federal search warrant for the vehicle. Inside, the detectives found a cell phone charger plugged into the dashboard cigarette lighter, and a second cell phone charger in the passenger compartment, each of which fit one of the four phones found on Kennedy at the time of arrest. The detectives then opened the locked glove compartment and found a semi-automatic handgun, a magazine containing around 30 rounds of ammunition, and a plastic bag containing smaller bags with an off-white chunky substance later confirmed to be 202 grams of cocaine base.

**B.**

On August 30, 2006, a grand jury indicted Kennedy on two counts of possession of 50 grams or more of cocaine base ("crack") with intent to distribute under 21 U.S.C. § 841(a)(1); two counts of possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c); and two counts of possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). One count of each crime related to the evidence obtained at the First Avenue address and one count of each crime to the evidence obtained from the silver Camry. Kennedy filed a motion to suppress both the evidence obtained from the home on First Avenue and the evidence obtained from the Camry. Following a hearing, the District Court issued a written

opinion denying the motion. *See United States v. Kennedy*, No. 06-23, 2007 WL 1740747 (E.D. Pa. June 15, 2007).

As to the search of the home on First Avenue, the District Court held both that Kennedy lacked standing to contest the search because he had not shown any connection to the house, and that the search was proper because there was a substantial basis for the magistrate judge's determination that there was probable cause to support the issuance of a warrant. *Id.* at *2-3.

As to the searches of the silver Camry, the District Court acknowledged that the Third Circuit had not yet directly addressed the question of whether an individual who borrows a rental car but is not an authorized driver under the rental agreement has standing to challenge a search of the rental car. The District Court cited *United States v. Baker*, 221 F.3d 438 (3d Cir. 2000), for the proposition that to "determin[e] whether someone who borrowed a car had a reasonable expectation of privacy in it," a court must conduct a "'fact-bound' inquiry assessing 'the strength of the driver's interest in the car and the nature of his control over it'" *Kennedy*, 2007 WL 1740747 at *4 (quoting *Baker*, 221 F.3d at 442).

Relying on *Baker*, the District Court found that because Kennedy had Fields's permission to use the car, a driver's license, and was in fact driving the car on January 18, he had a reasonable expectation of privacy in the car. *Id.* Nevertheless, the District Court found that under the circumstances, including the absence of an authorized driver to remove the car from the street, it was reasonable for the police to honor the rental company's request and impound the

6

car.  Under settled law, the impoundment made it permissible to conduct an inventory search of the car's contents.  *Id.* at *4-5.  Accordingly, in light of what it found to be constitutionally valid procedures, the District Court denied Kennedy's Motion to Suppress in its entirety.

After three days of trial, the District Court declared a mistrial when the jury could not reach a verdict.  Kennedy was retried on only one count each of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 924(c), and 18 U.S.C. § 922(g)(1), all relating to the evidence found in the car.  After a two-day trial, the jury returned a verdict of guilty on those three remaining counts.  The District Court then sentenced Kennedy to a term of imprisonment of 300 months followed by a 10 year period of supervised release.  This timely appeal followed.

## II.

## A.

We "review the district court's denial of [a] motion to suppress for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts."  *United States v. Silveus*, 542 F.3d 993, 999 (3d Cir. 2008) (quoting *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998)) (internal quotation marks omitted).  "[T]he proponent of a motion to suppress bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy in [the place searched]."  *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (internal quotations omitted) (second set of

7

brackets in original).[1]

## B.

As previously stated, the District Court found that because Kennedy had Fields's permission to use the car she rented, Kennedy had a reasonable expectation of privacy in its contents. The Government argues that we should reverse the District Court's holding that Kennedy had standing to challenge the search of his car in the first instance. Although the right to challenge a search on Fourth Amendment grounds is generally referred to as "standing," the Supreme Court has clarified that the definition of that right "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978). Accordingly, standing to challenge a search is not a threshold issue that must be decided before reaching the question of whether a search was or was not constitutional. *See, e.g.*, *United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 215-16 (3d Cir. 1998) (assuming, without deciding, that appellant had standing to challenge search but nevertheless reversing district court's suppression of evidence). The Court may therefore affirm the district court on any ground supported by the record, whether because Kennedy lacked standing to challenge the search, or because the officers' search did not run afoul of the Fourth Amendment. *E.g.*, *United States v. Mussare*, 405 F.3d 161, 168 (3d Cir. 2005).

---

[1] We have jurisdiction over this matter under 28 U.S.C. § 1291, pursuant to Kennedy's timely filing of a notice of appeal from the order of judgment entered on April 1, 2009.

Fourth Amendment standing "requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched[.]" *United States v. Baker*, 221 F.3d at 441 (citing *Rakas*, 439 U.S. at 143; *California v. Greenwood*, 486 U.S. 35, 39 (1988)). With regard to the objective prong of this test, which is at issue here, a reasonable or legitimate expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 143 n.12); *see also, e.g.*, *Bond v. United States*, 529 U.S. 334, 338 (2000) ("Our Fourth Amendment analysis . . . . inquire[s] whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable.") (internal quotation and citation omitted); *Carter*, 525 U.S. at 101 (1998) (Kennedy, J., concurring) ("The application of [the standing] rule involves consideration of the kind of place in which the individual claims the privacy interest and what expectations of privacy are traditional and well recognized.").

While "[e]xpectations of privacy protected by the Fourth Amendment . . . need not be based on a common-law interest in real or personal property, . . . by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment." *Rakas*, 439 U.S. at 143 n.12. Therefore, "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [his] right to

9

exclude." *Id.*; *see also United States v. Acosta*, 965 F.2d 1248, 1256-57 (3d Cir. 1992) ("Recent cases . . . reflect the Supreme Court's continued consideration of property interests in determining Fourth Amendment privacy interests.")  With these considerations in mind, we turn to the record before us.

## C.

The District Court relied on our decision in *United States v. Baker*, 221 F.3d 438 (3d Cir. 2000), in reaching its conclusion that Kennedy had standing to challenge the search of the car.  In *Baker*, the defendant was arrested for driving a car to his parole office, because driving was an express violation of his parole conditions.  The parole officers searched the car, which was registered in someone else's name, and discovered drug paraphernalia.  The officers then conducted a warrantless search of Baker's home, in which they found weapons and heroin.  221 F.3d at 440-41.  Although testimony that Baker's friend owned and had lent him the car conflicted with the identity of the owner of the car as listed in its title and registration, for purposes of the standing analysis we assumed that the defendant had "borrowed it from a friend and had been driving it for four to six weeks." *Id.* at 442.

In determining whether Baker had standing, we stated that "whether the driver of a car has the reasonable expectation of privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it[.]" *Id.* at 442 (collecting cases).  Because he had been lent the car by a friend, "had been driving it for four to six weeks[,]" and

had "carried the keys to the car with him into the parole office[,]" we concluded that "Baker had a reasonable expectation of privacy in the car." *Id.* at 442-43. *Baker* thus stands for the proposition that, in conducting the "fact-bound" inquiry into whether a driver has a legitimate expectation of privacy in a car, a person who lawfully borrows a car from another and exercises substantial control over it may well have a legitimate expectation of privacy. This, however, does not speak to the distinct factual scenario presented here: whether someone who has been given permission to drive a vehicle by its renter, without the knowledge of its owner and in contravention of the rental agreement, nevertheless has standing to challenge a search of that vehicle. Accordingly, we disagree with Kennedy that *Baker* augurs in favor of any particular outcome here.

Instead, recognizing that the inquiry must remain "fact-bound," we concur with the majority of circuits that have considered this factual scenario and conclude that, as a general rule, the driver of a rental car who has been lent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy. *See, e.g.*, *United States v. Seeley*, 331 F.3d 471, 472 n.1 (5th Cir. 2003) (per curiam) (finding that driver of rental car lacked standing where he was not the renter or authorized driver); *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) (holding that unauthorized driver of rental car who had been given permission to drive by co-defendant, an authorized driver, lacked standing); *United States v. Roper*, 918 F.2d 885, 887-88 (10th Cir. 1990) (defendant lacked standing where car he was driving was rented by co-defendant's common law wife

11

and he was not listed as additional driver in rental contract); *cf. United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001) (noting that "as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle" but nevertheless finding that the defendant had standing in light of the "truly unique" facts of that case).

Unlike the defendant in *Baker*, an individual who borrows a rental car without the permission or knowledge of the owner not only acts in contravention of the owner's property rights, but also deceives the owner of the vehicle while increasing the risk that the property will be harmed or lost. Although property law is not controlling, neither is it irrelevant. *See Rakas*, 439 U.S. at 143 n.12 ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."). An authorized driver on the rental agreement has lawful possession of the vehicle and, within the scope of the rental agreement, may legitimately exclude others from using it. *See, e.g., United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001) ("A person listed as an approved driver on a rental agreement has an objective expectation of privacy in the vehicle due to his possessory and property interest in the vehicle."). In contrast, an unauthorized driver has no cognizable property interest in the rental vehicle and therefore no accompanying right to exclude. The lack of such an interest supports the position that it is objectively unreasonable for an unauthorized driver to expect privacy in the vehicle. *See Rawlings v. Kentucky*, 448 U.S. 98 (1980) (Blackmun, J., concurring) (stating that "[n]ot every concept of ownership or possession is 'arcane'"

12

and "'the right to exclude' is an essential element of modern property rights" that "often may be a principal determinant in the establishment of a legitimate Fourth Amendment interest"). Accordingly, we agree with the majority of circuits which have considered this scenario and find that such circumstances will normally take one outside the well-recognized and shared understandings of privacy in our society.

Kennedy urges us instead to follow the decisions of the Eighth and Ninth Circuits, which have held that an unauthorized driver of a rental car has standing where the renter gives him permission to use the vehicle. *See United States v. Thomas*, 447 F.3d 1191, 1198-99 (9th Cir. 2006) (citing *Rakas*, 439 U.S. at 143, for the proposition that the unauthorized driver of a rental car has standing where given permission by the authorized driver, because "arcane distinctions developed in property . . . law . . . ought not . . . control" the standing inquiry); *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (stating that if the unauthorized driver had permission from the renter, the driver "would have a privacy interest giving rise to standing"); *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (per curiam) (unauthorized driver who presented no evidence that renter had given him permission to use rental car lacked standing, although evidence of "consensual possession" would have established standing).

The Ninth Circuit's decision in *Thomas*, which contains the most extensive reasoning among these decisions, deserves particular attention. In *Thomas*, a known associate of the defendant rented a car, listed only himself as an authorized driver, and then lent the car to Thomas. 447 F.3d

at 1194-95. In light of these facts, the Government argued that Thomas lacked standing to challenge the search of the car because "a driver has no legal right to control or to possess a rental car in contravention of the lease agreement." *Id.* at 1198. The Court rejected this argument, noting that even where "an unauthorized driver may be in violation of the rental agreement, we have previously held that a privacy interest exists *even if* a defendant is in technical violation of a leasing contract." *Id.* To support this assertion, it cited to cases in which courts held that a lessee of an automobile or motel room maintains his or her privacy interest in the property even where the lessee maintains possession of the property after the agreement has expired. *See id.* (citing *United States v. Henderson*, 241 F.3d 638, 647 (9th Cir. 2000), *as amended* Mar. 5, 2001 (lessee of rental car has reasonable expectation of privacy even after expiration of agreement, as long as he maintains possession and control of the car); *United States v. Dorais*, 241 F.3d 1124, 1129 (9th Cir. 2001) (expiration of motel room rental period, in absence of affirmative acts by lessor to repossess, does not automatically terminate lessee's expectation of privacy); *United States v. Cooper*, 133 F.3d 1394, 1398-1402 (11th Cir. 1998) (renter has reasonable expectation of privacy even after rental car lease has expired); *United States v. Owens*, 782 F.2d 146, 150 (10th Cir. 1986) (motel guest maintains a reasonable expectation of privacy in motel room even after check-out time)).

From the holdings of these cases, as well as the Supreme Court's admonition that "'arcane distinctions developed in property and tort law . . . ought not . . . control' the reasonableness of an expectation of privacy," *Thomas*, 447 F.3d at 1199 (citing *Rakas*, 439 U.S. at 143), the Ninth

14

Circuit determined that "an unauthorized driver who received permission to use a rental car and has joint authority over the car may challenge the search to the same extent as the authorized renter." *Id.*

We do not, however, find the analysis in *Thomas* persuasive. The Ninth Circuit reasons that a lessee's "technical" violation of a lease agreement by untimely returning the leased property is substantially analogous to a violation of a lease agreement by lending that property to a third party who is not discussed in the lease. Hence, it concludes that the two types of breach should be treated the same for purposes of determining whether there is a reasonable expectation of privacy. The persuasiveness of the analogy breaks down, however, when one considers the different risks that each type of breach creates for the property owner, the different precautions that owners take to protect against each breach, and the corresponding differences with which society is likely to view those breaches.

The risk of additional harm to or loss of leased property is likely to be small and easily quantifiable where the lessee merely maintains possession of the property past the expiration of the lease agreement. Indeed, because normally the expected loss will merely increase in proportion to the amount of time that the property is being used, the owner can easily seek compensation for this breach of the lease by charging an additional pro rata fee based on the amount of additional time that the property is used. *See* Darren M. Goldman, Note, *Resolving a Three-Way Circuit Split: Why Unauthorized Rental Drivers Should Be Denied Fourth Amendment Standing*, 89 B.U. L. Rev. 1687, 1722 &

n.285 (2009) (citing to actual rental car contracts that "account for tardiness and build in penalty fees should a driver return the car late").

However, the risk of loss or harm is likely to be quite difficult to quantify, or even estimate, where an unknown and unauthorized individual uses the leased property. In the rental car context, car rental agencies will normally require renters to provide information about all authorized drivers, such as their ages, whether they have valid driver's licenses, and access to their driving records. Of course, there are no means for agencies to obtain this information for unauthorized drivers. They will therefore face significantly higher risks because of the possibility that an unauthorized driver does not have a license, is a young and inexperienced driver, or has a history of accidents or criminal activity.

Moreover, the Ninth Circuit's reliance, in *Thomas*, on cases where the lessee of a motel room or apartment maintained his expectation of privacy even after the agreement had expired, is inapposite. We have previously noted, as has the Supreme Court, that an individual generally has a greater expectation of privacy in his home or "living quarters" than he does in an automobile. *See United States v. Mosley*, 454 F.3d 249, 259 (3d Cir. 2006) (noting that "the Fourth Amendment has been repeatedly characterized by the Supreme Court as affording enhanced protection to the home, and diminished protection to vehicles.") (internal citations and quotations omitted). Accordingly, while the expectations of privacy of one who rents an apartment or motel room may survive the termination of the lease under certain circumstances, this does not mean that expectations of privacy will necessarily extend beyond the termination of a

16

rental car agreement.

In light of these considerations, we believe that society views authorized drivers who return rental cars a few hours late quite differently from unauthorized drivers who borrow rental cars without the rental company's knowledge or permission. While the former is a largely harmless and even expected occurrence that can be easily managed by the owner, the latter is a deceptive means of placing unbargained-for risk of property harm and loss onto the rental company. Because we find the reasoning of the Ninth Circuit's contrary rule in *Thomas* unpersuasive, we join the majority of circuits in concluding that the lack of a cognizable property interest in the rental vehicle and the accompanying right to exclude makes it generally unreasonable for an unauthorized driver to expect privacy in the vehicle. We therefore hold that society generally does not share or recognize an expectation of privacy for those who have gained possession and control over a rental vehicle they have borrowed without the permission of the rental company.

We do acknowledge *United States v. Smith*, 263 F.3d 571 (6th Cir. 2001), as an example of extraordinary circumstances that might overcome the general rule that we adopt here. In *Smith*, the Sixth Circuit upheld an order suppressing evidence in the case of a defendant who was an unauthorized driver of the rental car that was searched. However, the defendant was also the husband of the woman who had rented the car four days earlier and had himself "personally contacted the rental car company . . . and reserved the vehicle in his name, using his own credit card, which was billed for the rental." *Id.* at 582. The Sixth Circuit explained that the defendant's "business relationship with the rental

17

company and his intimate relationship with his wife, the authorized driver of the vehicle, are relationships which are recognized by law and society[,]" and "[b]ased on these relationships, as well as the fact that he personally paid for the vehicle, Smith had both a subjective and an objective legitimate expectation of privacy." *Id.* at 587.

In this case, we discern none of the extraordinary circumstances present in *Smith*. Unlike *Smith*, where the driver "was the *de facto* renter of the vehicle," here Kennedy "was simply granted permission by the 'renter' of the vehicle." *Smith*, 263 F.3d at 586-87. Although Kennedy had the permission of the renter to operate the vehicle, he did not have the permission of the owner. As examined above, any expectation of privacy he subjectively held in the vehicle was therefore objectively unreasonable. Accordingly, we hold that Kennedy lacks standing to contest the search of the rental vehicle.

Further, even had Kennedy pointed to such extraordinary circumstances, we would nevertheless find that he lacks standing under the particular facts here. Because Kulp Car Rental, as lawful owner, informed law enforcement that Kennedy was an unauthorized driver and instructed them to impound the car until Kulp could recover it, any residual expectation of privacy that Kennedy might have acquired would have been effectively terminated by Kulp's directive.[2]

---

[2] Because we hold that Kennedy does not have Fourth Amendment standing to challenge the search of the rental car, we do not reach the issue of whether the impoundment of the car was an unconstitutional seizure.

18

## III.

Finally, Kennedy challenges the sufficiency of the evidence based upon which the jury found him guilty. Because Kennedy did not preserve the issue of sufficiency of the evidence by raising an objection at the close of the evidence, we will reverse only if we find plain error. *United States v. Leahy*, 445 F.3d 634, 654-55 (3d Cir. 2006). "We must view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 657.

Kennedy contends that although the evidence presented at trial established that he had access to the rental car and the contraband in it, Fields and possibly unidentified others also had access to and drove the car on the day of its seizure. Kennedy also cites to cases both within and outside the Third Circuit holding that the neither a defendant's mere proximity to contraband nor his mere presence at the property where contraband is located is sufficient to demonstrate the "dominion and control" over the contraband that is necessary to support a finding of actual or constructive possession. Having conducted a thorough and careful review of the record, we find that the cases relied on by Kennedy are inapposite and that the jury could have reasonably credited Fields's testimony that she was neither aware of nor involved with the contraband in the car. We therefore conclude, viewing the evidence in the light most favorable to the government, that a reasonable jury could have found beyond a reasonable doubt that Kennedy had both knowledge as well as dominion and control over the drugs and firearms found in the vehicle.

19

## IV.

For the foregoing reasons, we affirm the judgment of the District Court.